IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 16, 2025

**MICHAEL DEWAYNE WRIGHT, JR. v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
No. 2018-B-1127    Khadija Lanice Babb, Judge
_____

**No. M2024-01230-CCA-R3-PC**
_____

Petitioner, Michael Dewayne Wright, Jr., was convicted by a Davidson County Criminal Court jury of first degree felony murder, voluntary manslaughter, and first degree premeditated murder, for which he is serving two consecutive life sentences. Petitioner subsequently filed a petition for post-conviction relief, which the post-conviction court denied after a hearing. On appeal, Petitioner contends that he was denied the effective assistance of counsel based upon (1) trial counsel's conflict of interest stemming from representing two other suspects at the same time he represented Petitioner; (2) trial counsel's failure to compel the same two suspects to testify at trial; (3) trial counsel's failure to consult or call as a witness a firearms expert; (4) trial counsel's failure to conduct an adequate investigation and prepare for trial; and (5) the cumulative effect of these errors. Petitioner also asserts that the trial court failed in its duty to inquire about trial counsel's conflict of interest. Finally, Petitioner asserts that the trial court failed to adjudicate Petitioner's request for DNA testing pursuant to the Post-Conviction DNA Analysis Act ("the DNA Act"). Following a thorough review, we affirm the post-conviction court's denial of relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and KYLE A. HIXSON, J., joined.

Daniel A. Horwitz, Lindsay Smith, and Melissa K. Dix, Nashville, Tennessee, for the appellant, Michael Dewayne Wright, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Glenn R. Funk, District Attorney General; and Roger D. Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

This summary is obtained from this court's opinion in the direct appeal. *State v. Wright*, No. M2019-00082-CCA-R3-CD, 2020 WL 3410247, at *1 (Tenn. Crim. App. June 22, 2020). Petitioner was convicted for the shooting deaths of two victims who were in a romantic relationship, Gregory "Pee Wee" Johnson and Daresha Cole. On February 23, 2014, Petitioner approached Mr. Johnson's car at gunpoint. Mr. Johnson, apparently in an effort to flee, hit the gas pedal, lost control, and drove his car through a wrought iron fence and struck a concrete barrier. Two witnesses heard a gunshot. They called 911 and reported the shooting, telling the operator that they observed a "skinny man" in dark clothes murmur expletives and run away.

When officers from the Metropolitan Nashville Police Department (MNPD) arrived, they found Mr. Johnson's body in the driver's seat of his car, his phone missing, and there was $220 in cash strewn about the center console. The witnesses described a car that had been following Mr. Johnson's car on the night of the offense.

A few hours later, law enforcement received a 911 call regarding a second homicide. Upon arrival at the second crime scene, the body of Ms. Cole was found in her car with a fatal gunshot wound to her head. Detectives were able to match the description that the Johnson witnesses had provided with the car in which Ms. Cole's body was found.

Police interviewed Petitioner shortly after the killings. Petitioner claimed to have been with his girlfriend, Mykia Crutcher, at their apartment at 733 Glenview Drive [("the Glenview apartment")] for the entirety of that night and denied involvement in the offenses.

Following an investigation, detectives with MNPD ruled out potential suspects and charged Petitioner with the two homicides. The State's theory was that Ms. Cole wanted retribution and arranged to have Mr. Johnson robbed by Petitioner and that Petitioner killed Ms. Cole to ensure she would not cooperate with police concerning the murder of Mr. Johnson.

Following a four-day trial, a Davidson County jury convicted the Defendant of first degree felony murder in the perpetration of or attempt to perpetrate a robbery of Mr. Johnson, the voluntary manslaughter of Mr. Johnson, and first degree premeditated murder

of Ms. Cole for which he received consecutive sentences of life imprisonment.[1]  Petitioner timely appealed claiming the trial court erred in denying his motion to dismiss based on a violation of the Interstate Compact on Detainers, in denying his motion to sever offenses, in admitting his social media posts, and in aligning his sentences consecutively.  Petitioner also claimed the evidence was not sufficient to sustain his convictions.  This court affirmed the judgments of the trial court.  *Id*.

Post-Conviction Relief Petition

Petitioner filed a timely petition for post-conviction relief, in which he argued that he had received ineffective assistance of counsel due to trial counsel's failure to (1) disclose active conflicts of interest stemming from his concurrent representation of Petitioner, Ms. Crutcher, and Mr. Carr, all of whom were suspects, which Petitioner argued impaired the presentation of his defense; (2) consult and present as a witness a firearms and toolmark expert to testify that two different guns were likely used in the murders; (3) have "critical and potentially exculpatory DNA" tested that "could have inculpated other suspects," including Ms. Crutcher and Mr. Carr; (4) call Ms. Crutcher as a witness; (5) prepare a meaningful defense; and (6) communicate the substance of plea negotiations to Petitioner when the State invited Petitioner to make an offer to settle the case.  Petitioner also argued that the cumulative effect of these errors entitled him to a new trial.

As an independent issue, Petitioner requested that DNA samples from the Johnson crime scene be tested pursuant to the DNA Act.  Petitioner argued that DNA from a lollipop stick found in Mr. Johnson's car should be compared to DNA samples from Ms. Cole, Ms. Todd, Ms. Conway's teenage sister, and Mr. Carr; the sample had already been compared to Petitioner's DNA, and he had been excluded as a contributor.  Petitioner also averred that two samples from Mr. Johnson's boxer shorts should be compared to samples from Ms. Todd and Ms. Conway's teenage sister; the sample had already been compared to Ms. Cole's DNA, and she was excluded as a contributor.  Petitioner asserted that, if the DNA samples matched these other individuals, he likely would not have been prosecuted and convicted because witnesses only saw one person fleeing the scene after Mr. Johnson was shot.

Post-Conviction Hearing

At the evidentiary hearing on the petition, MNPD Detective Curtis Hafley testified that he was assigned to the Johnson case and that Detective Fuqua was assigned to the Cole case.  When they discovered that Ms. Cole's vehicle was used in Mr. Johnson's murder, they began working jointly.  A large group of people—Petitioner, Sean Carr, Mykia

---

[1] The trial court merged the voluntary manslaughter conviction into the felony murder conviction.

Crutcher, Zedric Corbin, and several unidentified young women—were initially considered suspects. Detectives collected alibis and gradually narrowed the field.

When asked what steps the detectives took to investigate Mr. Carr, Detective Hafley testified that they took "the same steps" as they did to investigate Petitioner. Detective Hafley stated that the police interviewed Mr. Carr, executed a search warrant for the Glenview apartment, and obtained Mr. Carr's cell phone records and a search warrant for the cell phone's contents. The location data from Mr. Carr's phone showed he was *not* near either crime scene.

Detective Hafley collected fingerprints from Mr. Johnson's car, compact discs (CDs) found inside the car, and a revolver and magazine and submitted the prints for testing for comparison with prints from Ms. Cole, Mr. Johnson, Mr. Corbin, and Petitioner. He said the results were listed as inconclusive. Detective Hafley said he did not obtain fingerprints from Mr. Carr because no witnesses placed Mr. Carr at the scene of either murder. Detective Hafley agreed that he interviewed Marcus Banes. When asked whether Mr. Banes placed Mr. Carr at the crime scenes, Detective Hafley responded that Mr. Banes was in jail at the time of the murders. Detective Hafley did not remember whether Mr. Banes had information about Mr. Carr's being at the crime scenes, although he recalled that unspecified people had said that Mr. Carr, Petitioner, and Ms. Cole left together "when presumably they left to go and do what they did that ended up in the death of [Mr.] Johnson." Detective Hafley noted that "somebody just saying that somebody walked out with them is not enough for the State to move forward" with criminal charges.

Detective Hafley testified that they requested DNA comparison of a lollipop stick with samples from Mr. Johnson, Ms. Cole, and Petitioner. Detective Hafley stated that he did not have DNA samples from Mr. Carr, Ms. Conway's teenage sister, and Ms. Todd to compare to the lollipop stick sample. Detective Hafley noted that he would have requested a search warrant for other suspects' DNA samples had he possessed enough evidence to obtain one.

Detective Hafley said that they compared DNA from Mr. Johnson's boxer shorts to DNA from Ms. Cole.[2] He said that Mr. Johnson's "primary girlfriend" was Ms. Todd, although he was also potentially involved with Ms. Conway's teenage sister. Detective Hafley did not obtain a search warrant for Ms. Todd's or Ms. Conway's teenage sister's DNA. The DNA profile for the swabs matched Mr. Johnson, and Ms. Cole was excluded as a contributor.

---

[2] Detective Hafley's police report, which was entered as an exhibit, reflected that that the police had learned about a rumor that Ms. Cole had lured Mr. Johnson to the crime scene by promising him oral sex.

- 4 -

Detective Hafley testified that MNPD officers collected the Hi-Point pistol, cell phones, and other electronic devices from the Glenview apartment pursuant to a search warrant. Mr. Carr's girlfriend, Ms. Primm, was the leaseholder for the apartment. Detective Hafley did not remember if any ammunition was found with the pistol. He affirmed that they sent all of the seized items for testing.

Special Agent Steve Scott testified as a firearms expert at the trial. A copy of Agent Scott's TBI firearms examination report, which was entered as an exhibit at the post-conviction hearing, showed that the TBI received a bullet collected at Mr. Johnson's autopsy, a "40S&W cartridge case" from the Johnson crime scene, and the Hi-Point pistol, magazine, and unfired cartridges from the Glenview apartment. The firearms report stated that, after test firing the Hi-Point pistol, Agent Scott concluded it did not fire the projectiles or cartridge casings collected at either crime scene. Agent Scott did not test the unfired cartridges.

Detective Hafley testified that based on the Cole crime scene report five "Hornady .40 Caliber S&W Cartridge Casings," one "Winchester .40 Caliber S&W Cartridge Casing," and one "Projectile Jacket" were recovered at the scene. He believed they were found in the Hi-Point pistol. Detective Hafley did not know if the unfired cartridges submitted to Agent Scott were the same ones taken from the Hi-Point pistol.

Detective Hafley testified that Ms. Crutcher was one of the last people known to be with Ms. Cole at the Glenview apartment and that Ms. Crutcher was initially a suspect. He said that Ms. Crutcher arranged for Detective Fuqua to receive a call from trial counsel setting up a February 26, 2014 meeting with trial counsel, trial counsel's son, Mr. Carr, and Petitioner at the Davidson County Courthouse. He said that the interview report noted that trial counsel was also present as Ms. Crutcher's attorney and that his understanding was that both trial counsel and trial counsel's son were present as Mr. Carr's attorneys.

A recording of Ms. Crutcher's interview was received as an exhibit and showed that trial counsel sat beside Ms. Crutcher during the interview. Ms. Crutcher told detectives that she and Petitioner stayed at the Glenview apartment all night except for when they went to a dollar store. An audio recording of both Petitioner's and Mr. Carr's interviews, which occurred in sequence in the courthouse hallway, was for the most part unintelligible. Petitioner's interview occurred first and Petitioner can be heard stating that he was done answering questions.

After Petitioner left, the detectives asked trial counsel, "Your girl is [Ms. Crutcher]? Cause you represent him too, right?" Trial counsel responded, "I don't really represent [Ms. Crutcher]. I just represent [Petitioner]." Trial counsel explained that he had known Petitioner's father for years and that, when Mr. Carr told Petitioner that he was going to speak to the police, Petitioner told Mr. Carr that he needed to talk to an attorney.

Petitioner's father then called trial counsel and asked him to speak to Mr. Carr. Detective Hafley noted that they wanted to speak to Ms. Crutcher a second time and asked, "[I]s this something where we need to talk to you first before we call her again, or . . . ?" Trial counsel responded, "Well, she's not under arrest or anything, so you don't have to."

On cross-examination, Detective Hafley testified that he did not recall whether Petitioner or Mr. Carr were present during the search of the Glenview apartment. He stated that the Hi-Point pistol was ultimately determined not to be involved in the victims' murders, although it was connected to an unrelated homicide case in Rutherford County.

Detective Hafley testified that many people were identified as potentially being involved in the murders or knowing about them. He said that he had no proof that anyone they interviewed other than Petitioner was present at the respective crime scenes. Detective Hafley stated that no probable cause existed to support a warrant for DNA samples from other individuals.

Detective Hafley testified that he investigated Mr. Carr and that there was no evidence to connect him to a weapon associated with the murders or charge him with a crime; accordingly, Detective Hafley did not obtain major case prints from Mr. Carr. He agreed that the murder weapon or weapons were never recovered. Detective Hafley stated that Ms. Crutcher was an alibi witness for Petitioner, that she gave no incriminating information about Petitioner, and that her statement supported Petitioner.

Former Davidson County Assistant District Attorney Kristen Kyle-Castelli testified that she was the lead prosecutor in Petitioner's case. She stated that her practice in double homicides was to invite the defense attorney to extend an offer the defendant would be willing to accept, but that she had no memory of trial counsel's bringing her a plea offer.

General Kyle-Castelli agreed that the police investigated multiple other suspects, including Mr. Carr; she stated that, although Ms. Crutcher was a "person of interest," she did not think Ms. Crutcher was suspected of being the shooter. General Kyle-Castelli said that, to her recollection, trial counsel represented Mr. Carr and Ms. Crutcher before the State filed charges against Petitioner. Investigative notes provided by the State in discovery were received as an exhibit. In the document, Detective Hafley summarized the February 25, 2014 interview with Ms. Crutcher and referred to trial counsel as Ms. Crutcher's attorney. She noted that trial counsel's representation of Mr. Carr and Petitioner after criminal charges being brought or during the trial would have been a conflict.

A transcript of a June 18, 2018 pretrial motion hearing in Petitioner's case was received as an exhibit. During the hearing, the parties discussed trial counsel's intent to introduce Mr. Carr's statement to Mr. Pirtle that Mr. Carr was the person who killed Mr. Johnson. Trial counsel stated that, although he had issued a subpoena for Mr. Carr, he was

uncertain if it had been served. General Kyle-Castelli noted for the trial court that Petitioner would have to prove that Mr. Carr was an unavailable witness and that trial counsel had not presented any proof that he had attempted to serve Mr. Carr with a subpoena.

On cross-examination, General Kyle-Castelli testified that, at the time of Petitioner's trial, Mr. Carr and Ms. Crutcher had not been charged with any criminal offenses arising from the victims' murders.

Dr. Eric Warren, an expert in firearm and toolmark identification, testified that he reviewed Petitioner's case, including the MNPD evidence logs, TBI firearms reports, Agent Scott's report, and a portion of the trial transcript. He testified that the language Agent Scott used in his report when examining the cartridge casings recovered at both crime scenes indicated that the cartridge casings might have been fired by different weapons. He acknowledged that he did not personally examine the cartridge casings at issue or their photographs.

Dr. Warren testified that Agent Scott's report stated that the characteristics on a bullet recovered at Mr. Johnson's autopsy were common to a variety of 40 caliber firearms, including Glock, H&K, Kahr Arms, Sites, Vektor, and others. Dr. Warren noted that Agent Scott's analysis of the cartridge casing recovered at Mr. Johnson's crime scene only stated that the class characteristics were consistent with Glock firearms. Dr. Warren noted that some Smith & Wesson firearms created markings similar to Glocks.

Agent Scott had opined at trial that the gun being held by the Defendant in the photograph "appear[ed] to be a Glock pistol." When asked whether it was possible for Agent Scott to identify the type of firearm Petitioner was holding in a photograph on social media, Dr. Warren opined that it would be difficult. Dr. Warren stated that it would have been appropriate to say that the gun had an appearance "similar to or consistent with a Glock . . . . However, it would need to be qualified." Dr. Warren wrote in his report that many gun manufacturers "have replicated the Glock design because of its popularity," that "multiple foreign airsoft pistols . . . are exact copies of Glock firearms," and that Glock had licensed its brand to BB gun and airsoft gun manufacturers. Dr. Warren included a photograph of a Glock, a Glock-licensed BB gun, and a Glock-licensed airsoft pistol to demonstrate their similar appearances. He wrote that it could not be "conclusively determined" that the object in Petitioner's photograph was a Glock pistol, a "Glock clone pistol," or "even a real firearm[.]" Dr. Warren added that the TBI was not accredited to identify firearms based upon photographs and that the TBI's accrediting body did not offer such an option. He stated that "one way around that is simply not to put it on the report and just testify about it without there being a report," which he opined was inappropriate.

Dr. Warren's report was received as an exhibit. He noted Agent Scott's omission that the cartridge case from the Johnson scene could have been fired by a Smith & Wesson pistol instead of a Glock. Dr. Warren noted, "[A]gent Scott alluded to this in his testimony but was not asked to elaborate. This is another piece of evidence that could suggest the cartridge case from the Johnson case was unrelated and had been there from an earlier incident." Dr. Warren concluded that "there is stronger evidence supporting the fact that the cartridge case from the Johnson homicide was fired in a different firearm than the cartridge cases in the Cole homicide."

Relative to the five Hornady .40-caliber cartridge casings recovered at the Cole crime scene, Dr. Warren testified that Hornady was a "boutique manufacturer" of ammunition. Dr. Warren noted that the recording of the Glenwood apartment search included officers' finding Hornady brand ammunition, but that the search warrant return reflected that officers collected four .40-caliber cartridges, although the brand was not noted. Dr. Warren said that his review of the TBI reports did not reflect that any connection was made between the Hornady cartridges found at the Glenview apartment and the Hornady cartridge casings found at the Cole scene. Dr. Warren noted that, when he testified in criminal cases for the TBI, he routinely discussed the "circumstantial type of link" created by "boutique type" ammunition in multiple locations. He stated that, depending on the circumstances of the case, similar ammunition's being found two days after a homicide could be a stronger link to the crime.

Dr. Warren agreed that, at the time of trial in 2018, he could have assisted trial counsel in developing questions to ask Agent Scott on cross-examination. Dr. Warren stated that he and at least one other firearms expert in the area accepted "AOC rates."

On cross-examination, Dr. Warren testified that Agent Scott was one of the senior firearm and toolmark examiners when Dr. Warren was assigned to the Nashville TBI headquarters between 2009 and 2011. Dr. Warren stated that Agent Scott directly trained him, that they worked together, and that Agent Scott was an expert. Dr. Warren did not recall Agent Scott's saying "anything that was untrue" or incorrect during his trial testimony.

Relative to the unfired Hornady cartridges from the Glenview apartment, Dr. Warren acknowledged that the Hi-Point pistol was excluded as being the murder weapon in either case. He agreed that the unfired Hornady cartridges "didn't kill anyone" regardless of whether they had ever been loaded into the Hi-Point pistol. Dr. Warren further agreed that spent Hornady and Winchester cartridge casings were recovered at the crime scene "[a]s opposed to the Glenview [apartment] where [Petitioner] was one of the occupants[.]"

Dr. Warren testified that no weapon with polygonal rifling was ever submitted for testing to compare with the bullet recovered from Mr. Johnson at autopsy. He agreed that Agent Scott's report contained statements that he would perform further testing if a firearm was recovered. Dr. Warren further agreed that Agent Scott did all he could with the bullet. Dr. Warren stated that the pistol in Petitioner's social media photograph was consistent with a Glock pistol, although he opined that "the conclusion that it [was] a real firearm . . . is a little too strong."

Ms. Crutcher testified that she recalled staying at the Glenview apartment with Petitioner in 2014, that she was friends with Ms. Cole, and that she was with Ms. Cole the day before she was murdered. Ms. Crutcher did not recall Ms. Cole's fighting with Ms. Conway's teenage sister about Mr. Johnson or Mr. Cole's arguing with Mr. Johnson that day.

Ms. Crutcher testified that trial counsel arranged her police interview and attended "as [her] attorney." Ms. Crutcher agreed that she and trial counsel discussed the murders, but she was unwilling to waive attorney-client privilege relative to the content of those conversations. Ms. Crutcher invoked her Fifth Amendment right against self-incrimination relative to whether she was present or participated in the murders; whether she possessed or disposed of the murder weapons; and whether she shared a cell phone with Petitioner, ever took Petitioner's phone, or had access to the phone during the commission of the murders.

On cross-examination, Ms. Crutcher testified that she did not pay trial counsel to represent her. Ms. Crutcher affirmed that she had never been charged in connection with either murder.

Mr. Carr testified that he was living at the Glenview apartment in 2014. He denied being investigated in connection with the victims' murders. He initially said that the police talked to him about Mr. Johnson's murder but not about Ms. Cole's murder. He later averred, though, that he never spoke to the police about either murder and that they only discussed the gun at the Glenview apartment. He admitted that the gun found during the search was his, and he was later charged with unlawful possession of a firearm. Mr. Carr said that he posted bond and went to court on February 26, 2014, where the charge was dismissed. Mr. Carr said that he lived in Hendersonville, Tennessee, in 2018. He denied receiving a subpoena for Petitioner's trial, and he noted that he was in jail at the time. Mr. Carr stated that he did not remember telling Mr. Pirtle that he committed the murders or discussing the murders with him. Mr. Carr denied ever having met Mr. Johnson or having planned to rob him; driving Ms. Cole's car that night; being present when Ms. Cole was murdered; or participating in either murder.

On cross-examination, Mr. Carr denied participating in or committing the murders or confessing to anyone that he did. Mr. Carr testified that he was friends with Petitioner and that he knew Ms. Crutcher as the mother of Petitioner's child. He agreed that Ms. Cole also stayed at the Glenview apartment with them. Mr. Carr stated that the last time he saw Ms. Cole was when she picked up Ms. Crutcher from the Glenview apartment.

Trial counsel testified that he first learned of Petitioner's case when Ms. Crutcher "went in for an interview[.]" He stated that he began representing Petitioner after "some long-distance phone calls," although he did not remember when they occurred. Trial counsel agreed that he represented Petitioner in the early police interview.

Trial counsel testified that he did not remember Mr. Carr or that he was a suspect in Petitioner's case. Trial counsel did not recall Mr. Carr's fingerprints being discussed during the investigation. Trial counsel said he "never represented Mr. Carr" and never had an attorney-client relationship with Mr. Carr. He agreed that the discovery materials included the search warrant for the Glenview apartment and that a gun was seized. Trial counsel stated that the audio recording of the search warrant execution was "probably not made available" to him; he noted that the State provided more materials to post-conviction counsel than it did in pretrial discovery. Trial counsel said that the fingerprint comparisons in Petitioner's case were inconclusive.

Trial counsel testified that he probably received a copy of the subpoena request for Mr. Carr's phone records and saw any records received from the phone company. Trial counsel agreed that Petitioner's phone records were subpoenaed and submitted as evidence at trial. Trial counsel noted, "[T]o my memory, [Mr.] Carr was never a suspect . . . . [J]ust because something was subpoenaed during an investigation doesn't mean that they're guilty of something." Trial counsel remembered "something being asked" about cell tower traffic near downtown relative to location data. Trial counsel did not recall Detective Hafley's stating he was able to determine that Mr. Carr was not at the Johnson crime scene.

Trial counsel agreed that a Hi-Point pistol was found at the Glenview apartment but recalled that there was nothing connecting the pistol to these homicides. Trial counsel read from the police report that the police collected six unfired cartridges at the Cole crime scene, five Hornady brand and one Winchester brand.

Trial counsel testified that it was alleged that Mr. Carr and Mr. Johnson had sexual relationships with Ms. Cole and that Ms. Cole asked Petitioner to kill Mr. Johnson after finding out that Mr. Johnson was "messing around on her."

Trial counsel testified that he attempted to call Mr. Pirtle as a witness at trial because Mr. Carr had allegedly confessed to Mr. Pirtle that he committed one of the murders. Trial counsel said,

That was the only indication that I had that [Mr.] Carr had anything to do with it. It was just basically to throw it in there to see if I could create some reasonable doubt. But other than that alleged hearsay statement, there was nothing else that I remember that connected [Mr.] Carr.

Relative to Mr. Carr's police interview, trial counsel testified that he learned from the police that Mr. Carr had a court date and that they would be there to speak to Mr. Carr. After reviewing Detective Fuqua's police report, trial counsel stated that, during Ms. Crutcher's interview at the police station, the police told him that they wanted to speak to Petitioner and Mr. Carr. Trial counsel asked to call Petitioner's father and find out if Petitioner would be with Mr. Carr at the court date, and he later called Detective Fuqua to confirm the meeting time and location.

When asked whether he remembered speaking privately to Mr. Carr at the beginning of the interview, trial counsel responded, "No, ma'am. I didn't talk to [Mr.] Carr. My son did. That's the reason I had [my son] up there was because I thought there would potentially be a conflict." Trial counsel said that he told Petitioner, and his son told Mr. Carr, that they did not have to speak with the police; he recalled that one of them responded that they wanted to know what information the police wanted.

Trial counsel testified that he had no written conflict waiver from Petitioner about Mr. Carr because he never had an attorney-client relationship with Mr. Carr. He opined that no conflict existed because Mr. Carr was never charged.

Trial counsel testified that he accompanied Ms. Crutcher to her police interview, which he described as being "not about the crimes, but about where she was." Trial counsel denied having arranged the interview. He stated that Petitioner's father called him and asked him to meet Ms. Crutcher because Detective Fuqua wanted to speak with her. Trial counsel said that he called Detective Fuqua and informed him that he needed to wait to interview Ms. Crutcher until trial counsel was present. He noted that he did not want the police talking with a "potential client." He denied knowing Ms. Crutcher was a suspect, although he knew she was a person of interest. Trial counsel acknowledged a document from his case file that included the police alert for Ms. Crutcher and a possible firearm.

Trial counsel testified that he did not see any need to hire an independent firearms expert in this case. He stated that he probably stipulated to Agent Scott's qualifications. When asked whether evidence that two guns were used in the murders was "powerful evidence" against the State's theory that the same person killed both victims, trial counsel responded that people were not limited to having one gun. Trial counsel agreed that Agent Scott reached an inconclusive result when comparing the cartridge casings from the Cole and Johnson crime scenes; he did not recall what questions he asked Agent Scott about the inconclusive results. Trial counsel stated that he did not consult with an expert to prepare

- 11 -

his cross-examination of Agent Scott, and he noted that he was "more worried with the confessions that [Petitioner] gave to another man in the jail than . . . whether the bullets matched or not." Trial counsel further noted that the inconclusive results "really didn't prove anything one way or the other in my opinion."

When asked whether additional expert testimony about the three types of inconclusive firearms examination results would have been favorable to Petitioner, trial counsel responded, "I don't think anybody proved that the same firearm was used in the commission of these two murders." Trial counsel stated that all of the evidence was circumstantial, that the evidence "possibly" showed that two guns were used, and that "it was kind of all left up in the air." When asked whether additional expert testimony would have been important, trial counsel responded negatively, stating, "Because whether there was one gun used or two guns used was not going to convince the [j]ury that he didn't confess to somebody else that he committed the murders."

Trial counsel did not know whether the TBI's accreditation included identifying a firearm from a photograph. He recalled Agent Scott's opining that Petitioner was holding a Glock in the social media photograph. Trial counsel stated that he objected and that he, the prosecutor, and the trial court had a jury-out conference. Trial counsel said that the basis of the objection was that Agent Scott could not prove that the gun was real; he did not think his objection included that the opinion was beyond the scope of Agent Scott's expertise.

Trial counsel testified that he did not know with whose DNA the lollipop stick and boxer shorts samples were compared. He did not attempt to have the two DNA samples compared to suspects other than Petitioner; he noted that he did not have DNA samples from any other suspects.

Trial counsel testified that he subpoenaed Mr. Carr to testify and that he had an investigator search for him. He said that he did not subpoena Ms. Crutcher because she was Petitioner's girlfriend and had agreed to testify. Trial counsel stated that, after Ms. Crutcher conveyed that she did not think she could testify, he asked Petitioner if he needed to issue a subpoena. Trial counsel told Petitioner that a witness's reluctance to testify "usually means that they aren't going to testify to what they told you[.]" Trial counsel expressed concern that forcing Ms. Crutcher to testify would risk her testifying that Petitioner did not stay in the Glenview apartment all night. Trial counsel said that Petitioner assured him that he had spoken to Ms. Crutcher and that she would testify; however, Ms. Crutcher did not attend court the following day. Trial counsel denied that Petitioner and Ms. Crutcher "had different goals or different interests." Trial counsel asserted that he was never hired for "anything further" than Ms. Crutcher's police interview and that they did not have an attorney-client relationship at the time of Petitioner's trial.

- 12 -

On cross-examination, trial counsel testified that he had been practicing law since 1983; he estimated that 80 or 85% of his practice was in criminal defense. He said that he had represented 4,000 or 5,000 defendants in his career and had taken 100 to 125 cases to trial, including first degree murder cases.

Trial counsel agreed that, at the time Petitioner was indicted, Petitioner was in prison in Kentucky. He stated that Petitioner or his family called him after Petitioner learned that "there was a detainer for him for this sealed indictment." Trial counsel did not represent Petitioner after his police interview until after the indictment was returned one or two years later.

Trial counsel testified that he received discovery from the State and that he had a "good handle on" the facts and the State's evidence. He stated that Agent Scott's report and testimony did not directly connect Petitioner to the murders and that, as a result, he thought that it "didn't really matter" and did not merit his hiring a defense expert. Trial counsel said that he had no reason to doubt Agent Scott's qualifications. Trial counsel stated that he objected "strenuously" to Agent Scott's testimony about the gun in Petitioner's social media photograph. Trial counsel said that it was "[his] job not to find the murder weapon." Trial counsel stated that he had no reason to be concerned about the bullets in the Hi-Point pistol.

Trial counsel testified that he never perceived an actual or "even imagined" conflict of interest with anyone involved in Petitioner's case. He noted that he attempted to admit Mr. Carr's incriminatory statement through Mr. Pirtle but that the trial court would not allow it. Trial counsel agreed that because Mr. Carr testified at the post-conviction hearing that he never admitted to either murder, there was no reason to believe that Mr. Carr would have testified differently at trial.

Trial counsel testified that he exercised his best professional judgment and zealously represented Petitioner. He denied that Petitioner ever raised an issue with him regarding the representation, and he noted that Petitioner had sent him a letter thanking him.

Michael Wright, Sr., testified that he was Petitioner's father and that he paid trial counsel $1,500 to represent Petitioner, Mr. Carr, and Ms. Crutcher at their police interviews—$500 per person. Mr. Wright stated that Petitioner called the day after the murders and told him that the police wanted to question him, Mr. Carr, and Ms. Crutcher. Mr. Wright stated that he called trial counsel and described the situation. According to Mr. Wright, trial counsel told him that, if they were guilty, they should not go to an interview but that, if they were not guilty, they should answer the police's questions. Mr. Wright told trial counsel that they were not guilty, and trial counsel told him when to come to the police station. Mr. Wright stated that he paid trial counsel and not trial counsel's son.

On cross-examination, Mr. Wright testified that he paid in cash and that the receipt had since been lost. Mr. Wright stated that trial counsel had represented him several times and that they had never had a written representation agreement.

Petitioner testified that trial counsel represented him from the beginning of the murder investigation through the conclusion of his trial. Petitioner averred that he only met with trial counsel once for about ten minutes before trial. He denied that trial counsel ever discussed his representation of Mr. Carr or Ms. Crutcher or explained that his ethical duties to Mr. Carr and Ms. Crutcher might conflict with those he owed Petitioner. Petitioner stated that he would not have signed a written waiver of such a conflict had he known of it and that he would have requested another attorney. Petitioner stated that he and Mr. Carr were not present for one another's police interviews.

On cross-examination, Petitioner maintained that trial counsel talked with him for ten minutes throughout the whole case; he asserted that trial counsel did not discuss the defense strategy and "just took [him] to trial." He denied ever asking the trial court "what's going on here." When asked whether the ten-minute conversation included that Ms. Crutcher was an alibi witness, Petitioner stated that trial counsel spoke to Ms. Crutcher and subpoenaed witnesses. Petitioner said that he never discussed with Ms. Crutcher whether she would come to the trial. He denied seeing Ms. Crutcher during the first four days of trial. Petitioner did not recall trial counsel's telling him that Ms. Crutcher said she was not coming back for the fifth day of trial. Petitioner denied that he was supposed to call Ms. Crutcher and talk her into testifying.

Upon examination by the post-conviction court, Petitioner testified that he was twenty-four years old at the time of trial and that he had never had a case go to trial before. He stated that trial counsel had represented him previously in criminal cases. Petitioner stated that he had a different attorney for a criminal case in Kentucky.

The State recalled trial counsel as a witness. Trial counsel testified that he had three in-person meetings with Petitioner after he was transferred back to Tennessee custody. He stated that, at the first meeting, he had not yet received discovery from the State due to an "interstate compact alleged violation" and that he told Petitioner he would return to see him after he had the discovery materials. Trial counsel stated that they reviewed the discovery materials at the second and possibly third meetings, which lasted about an hour each. Trial counsel said that he saw Petitioner in person again the week before trial. He added that they also had "many" discussions at Petitioner's court dates. Trial counsel stated that, during trial, he gave Petitioner a pad and paper to take notes and asked Petitioner "about every little thing," including any questions he wanted counsel to ask the witnesses. Trial counsel noted, "[I]t's his life. So he's the one that needs to make the decisions."

- 14 -

The post-conviction court took the matter under advisement, instructed the parties to file post-hearing briefs, and subsequently filed an order denying the petition.

## Post-conviction court's findings

### 1. Conflict of interest regarding Mr. Carr

The post-conviction court found that Petitioner had not proven by clear and convincing evidence that trial counsel represented Mr. Carr in the courthouse interview and that no other evidence in the record indicated that trial counsel had represented Mr. Carr. The post-conviction court concluded that there was no attorney-client relationship, and by extension, no conflict of interest existed.

The post-conviction court noted that the audio recording of Mr. Carr's interview was "often inaudible and hard to decipher," and the court agreed with trial counsel's hearing testimony that the transcript "does not accurately depict the elapsed time between that day's events, and it erroneously gives the appearance that everything happened simultaneously." The post-conviction court discussed the following events during the interview, as documented in the transcript: (1) trial counsel's telling the detectives that he had just passed his son in the elevators; (2) Detective Hafley's question about informing Mr. Carr of his rights and trial counsel's answer that "[trial counsel's son] and me haven't had enough time to do our thing; (3) that neither attorney spoke for the remainder of the interview; (4) Mr. Carr's statement at the end of the interview that he could not talk to the police further "without my attorneys present" and Mr. Carr's hearing testimony that he was not referring to any attorney in particular; and (5) trial counsel's son thanking the detectives for "having us" and Detective Hafley's response of, "Well, and I appreciate y'all coming."

The post-conviction court found that both trial counsel and his son were present for the majority of Mr. Carr's interview. The court noted that it was unclear whether Petitioner was also present, but Petitioner denied that he had been there. The court found that, based upon the interview alone, it could not conclude that trial counsel represented Mr. Carr.

The post-conviction court credited trial counsel's testimony "adamantly" denying ever representing Mr. Carr or speaking to him privately, as well as his explanation that he brought his son to the interview to avoid a potential conflict. The court found that "the majority of the evidence in the record" supported trial counsel's position.

The post-conviction court found that Mr. Wright's testimony about the $1,500 fee was "neither persuasive nor illuminating" because trial counsel and his son practiced in the same law firm and that it would "not be abnormal for [trial counsel] to divide this fee in order to compensate and secure [his son's] appearance at the interview on behalf of [Mr.] Carr." The court noted that neither party had called trial counsel's son as a witness.

The post-conviction court noted that post-conviction counsel did not directly ask Mr. Carr if trial counsel had ever represented him. The court further noted that Mr. Carr did not remember the interview or whether he was represented by an attorney there.

The post-conviction court discussed Detective Hafley's testimony that the courthouse interview was "set up through a phone call" arranged by Ms. Crutcher, Mr. Carr, and Petitioner, as well as his statement that trial counsel called him later to schedule the interview. The court noted that none of the police reports submitted by Petitioner referred to trial counsel's representing Mr. Carr in the same manner that they referred to trial counsel's representing Ms. Crutcher. The court specifically noted that the reports "simply state that [trial counsel] called to set up a time to talk to" Mr. Carr and Petitioner at the fifth floor of the courthouse.

Relative to the pretrial conference in which General Kyle-Castelli commented that trial counsel had previously represented Mr. Carr, the post-conviction court found that trial counsel had requested that Mr. Carr be declared unavailable in order to admit Mr. Carr's confession to Mr. Pirtle. Trial counsel stated that he had issued a subpoena for Mr. Carr but was unsure whether it had been served. The State responded by arguing that trial counsel had not made a "good faith effort" to have Mr. Carr served and, as part of that argument, pointed out that trial counsel "has actually represented [Mr.] Carr in this very matter on February 26, 2014, when [he] was interviewed by detectives[.]" The post-conviction court found that General Kyle-Castelli's characterization of trial counsel and Mr. Carr's relationship was "conclusory and unsubstantiated." The court noted that it gave her statement "minimal weight" in the determination of whether an attorney-client relationship existed.

The post-conviction court found that trial counsel's seeking to introduce Mr. Carr's confession to Mr. Pirtle at the pretrial hearing was "illuminating and persuasive" evidence that trial counsel had never represented Mr. Carr and owned him no loyalty. The post-conviction court gave the finding "great weight."

The post-conviction court found that trial counsel had a history of representing Petitioner predating the courthouse interview, but Mr. Carr had no such history. The court stated, "This fact adds credence to [trial counsel's] contention that he brought [his son] to the courthouse interview in anticipation that a potential conflict of interest regarding his representation of the Petitioner could develop if [trial counsel] were to represent [Mr.] Carr."

The post-conviction court concluded that Petitioner did not establish by clear and convincing evidence that trial counsel represented Mr. Carr at the courthouse interview. The court stated, "Most importantly, no other evidence in the record supports the Petitioner's claim that [trial counsel] previously represented [Mr.] Carr in this case." The

court found that because no attorney-client relationship existed, no conflict of interest existed.

### 2.   Conflict of interest involving Ms. Crutcher

The post-conviction court recounted that, on February 25, 2014, trial counsel called Detective Fuqua on Ms. Crutcher's behalf to set up an interview. Detectives Fuqua and Hafley, trial counsel, Ms. Crutcher, and her mother were present at the police department for the interview. Thereafter, trial counsel called Detective Fuqua to arrange the courthouse interview. The court noted that charges were not brought until 2016, two years later, and that only Petitioner was indicted. The court further noted that Ms. Crutcher was expected to be an alibi witness at Petitioner's trial in 2018, but that trial counsel did not formally subpoena her because she agreed to testify. Trial counsel informed Petitioner of his right to subpoena her after she changed her mind, but this was not done, and Ms. Crutcher did not testify.

The post-conviction court found that Ms. Crutcher was never charged with the murders and that "there is no evidence in the record that suggests [she] actually committed either murder." The court found that trial counsel represented Ms. Crutcher for her police interview but was "unable to conclude that four . . . years later at [] Petitioner's jury trial . . . [trial counsel] was actively representing conflicting interests" or that the conflict adversely affected trial counsel's performance.

The post-conviction court noted that Ms. Crutcher was Petitioner's girlfriend and that they had a child together. The post-conviction court found that the cell phone evidence, which showed Petitioner's communicating by phone with Ms. Crutcher throughout the night in question, "weighs against the credibility and potential success of an alibi defense." The court concluded that, given the totality of the circumstances and "the all or nothing nature of alibi witness testimony," it was reasonable for trial counsel to interpret Ms. Crutcher's reluctance to testify as detrimental to Petitioner's case and that it was "prudent not to compel her testimony in front of the jury."

The post-conviction court found that no evidence indicated that trial counsel's prior representation of Ms. Crutcher affected his representation of Petitioner, that trial counsel "actively represented conflicting interests in this case," or that trial counsel was unable to provide Petitioner with zealous advocacy as a result of his limited representation of Ms. Crutcher four years prior to trial.

### 3.   Firearms expert

The post-conviction court found that Agent Scott's trial testimony was that the bullets and cartridge casings from the Cole and Johnson crime scenes were not fired by the

- 17 -

same weapon. The court noted Dr. Warren's testimony that Agent Scott's trial testimony was "complete and true" but that Agent Scott "could have clarified or supplemented some of his answers." The court stated that it did not "see how [trial counsel]'s failure to call his own expert to say the same thing caused [] Petitioner prejudice."

### 4. DNA testing

The post-conviction court's statement of the issue was, "Trial Counsel did not perform independent DNA testing on [two] critical pieces of evidence, and that DNA should be tested now." The post-conviction court found that Petitioner failed to demonstrate that the outcome of the trial would have been different if (1) the lollipop stick DNA had been compared to Ms. Cole, Ms. Todd, Ms. Conway's teenage sister, and Mr. Carr, or if (2) the DNA from Mr. Johnson's boxer shorts had been compared to Ms. Todd or Ms. Conway. The court found that "these results would not have had any effect on the evidence that ultimately convicted the Petitioner, such as his cell phone records, his jailhouse confession, and his social media postings." The court also concluded that it did not need to address whether trial counsel's performance was deficient in this regard because Petitioner had not proven that he was prejudiced. It did not further address Petitioner's request for DNA testing.

### 5. Trial counsel's investigation of Mr. Carr's cell phone records

The post-conviction court found that trial counsel's decision not to investigate time stamps or request a call detail record analysis of Mr. Carr's cell phone would not have affected the outcome of the trial. The court noted that the evidence included Petitioner's cell phone location data, Petitioner's jailhouse confession, Petitioner's inculpatory social media posts, and the physical description given by a witness at the Johnson crime scene, which was inconsistent with Mr. Carr's appearance. The post-conviction court concluded that Petitioner failed to prove he was prejudiced by the alleged deficiency.

### 6. Fingerprint evidence

The post-conviction court found that, relative to trial counsel's not questioning why major case prints for Mr. Carr were not requested, trial counsel testified that the only connection between Mr. Carr and the murders was his alleged statement to Mr. Pirtle. The post-conviction court found that trial counsel's opinion was reasonable "given the dearth of evidence in the record of [Mr.] Carr's involvement." The trial court concluded that "nothing about these claims can be classified as unprofessional errors" and that "these omissions" did not undermine confidence in the outcome of the trial.

- 18 -

*7. Failure to call Ms. Crutcher as a witness*

The post-conviction court found that trial counsel's decision not to call Ms. Crutcher as a witness after she changed her mind about testifying was "wise, professional, and competent under [the] circumstances." The court noted that trial counsel informed Petitioner that Ms. Crutcher's reluctance to testify made her an unreliable alibi witness. The post-conviction court also noted Ms. Crutcher's hearing testimony, which consisted of her repeatedly asserting her Fifth Amendment right against self-incrimination. The court found that trial counsel's decision was "a reasonable and sound strategic decision made by an experienced criminal defense trial attorney."

*8. Cumulative error*

The post-conviction court found that Petitioner did not establish that trial counsel's performance was deficient in any respect or that a reasonable probability existed that the outcome of his trial would have been different but for the alleged deficiencies. The court concluded that Petitioner suffered no cumulative error.

This timely appeal follows.

## Analysis

### I. Standard of Review

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id*.; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see Kendrick*, 454 S.W.3d at 457. The post-conviction court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

## II.    *Waiver*

As a preliminary matter, the State argues that Petitioner has waived three of his claims for failure to raise them in the post-conviction petition and because the post-conviction court did not address them: (1) that the trial court erred by failing to inquire about trial counsel's potential conflict of interest relative to Mr. Carr; (2) that trial counsel provided ineffective assistance by failing to compel Mr. Carr's testimony; and (3) that trial counsel provided ineffective assistance by failing to cross-examine detectives about Mr. Carr's cell phone location data.

Petitioner responds that he raised the issues in the post-conviction petition and that the State has waived its waiver argument for failure to object to inclusion of the issues at the post-conviction hearing and in its response to Petitioner's post-hearing brief. Petitioner requests that, if this court concludes that the issues were raised in the post-conviction petition, we remand the case for further findings by the post-conviction court on those issues.

Generally, appellate review is not afforded to issues not addressed by a post-conviction court, and plain error review is not available in post-conviction proceedings. *Holland v. State*, 610 S.W.3d 450, 458 (Tenn. 2020). An appellate court "may only consider issues that were not formally raised in the post-conviction petition if the issue was argued at the post-conviction hearing and decided by the post-conviction court without objection." *Id*. (citations omitted).

We first note that the State's potential waiver of its waiver argument is immaterial to the scope of our review. Our supreme court "has made clear that we may consider a post-conviction issue on appeal only when that issue (1) was formally raised in the post-conviction petition or an amendment; or (2) was argued at the evidentiary hearing *and* was decided by the post-conviction court without objection by the State." *Davis v. State*, No. M2023-00048-CCA-R3-PC, 2024 WL 446441, at *6 (Tenn. Crim. App. Feb. 6, 2024) (emphasis in original) (citing *Holland*, 610 S.W.3d at 458), *no perm. app. filed*.

Generally, if a petitioner fails to include a ground for relief in the post-conviction petition, it is waived. *See* Tenn. Code Ann. § 40-30-110(c) ("Proof upon the petitioner's claim or claims for relief shall be limited to evidence of the allegations of fact in the petition."); Tenn. Sup. Ct. R. 28, § 8(D)(4) ("The hearing shall be limited to issues raised in the petition."). However, a petitioner may amend the petition within thirty days or at any other time upon a showing of good cause. *See* Tenn. Code Ann. § 40-30-107(b)(2). In addition, if the State raises an objection, the post-conviction court may allow an amendment to the petition "and shall do so freely when the presentation of the merits of the cause will otherwise be subserved," including at the evidentiary hearing. Tenn. Sup. Ct. R. 28, § 8(D)(5); *see Lowe v. State*, 703 S.W.3d 319, 334-35 (Tenn. Crim. App. 2024).

## A. Trial court's duty to inquire about conflict of interest

It is undisputed that the post-conviction court did not address as a separate issue whether the trial court erred by failing to inquire about trial counsel's possible conflict of interest after General Kyle-Castelli mentioned at the pretrial hearing that trial counsel had represented Mr. Carr at his police interview. However, we need not decide whether the issue was indirectly raised in the post-conviction petition because this issue has been waived for failure to raise it on direct appeal.

Tennessee Code Annotated section 40-30-106(g) states:

A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:

(1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution required retroactive application of that right; or

(2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Petitioner could have raised this issue on direct appeal but did not do so.[3] The Sixth Amendment right to counsel, as informed by case law and our supreme court's ethics rules regarding a trial court's duty to inquire about conflicts of interest, existed at the time of the 2018 trial. *See generally Frazier v. State*, 303 S.W.3d 674 (Tenn. 2010); *Wheat v. United States*, 486 U.S. 153, 160 (1988). Additionally, Petitioner has not presented any evidence that his failure to present his claim was the result of state action. Accordingly, Petitioner has waived this issue for review in post-conviction proceedings. Tenn. Code Ann. § 40-30-106(g).

## B. Cross-examination using Mr. Carr's cell phone location data

The State argues that Petitioner has not preserved for appellate review whether trial counsel was ineffective for failing to cross-examine detectives about Mr. Carr's cell phone location data. In his reply brief, Petitioner argues that he explicitly raised this issue by discussing it in the conflict of interest section of the post-conviction petition. Petitioner

---

[3] We note that trial counsel did not represent Petitioner on direct appeal.

states:

> . . . [The] petition [also] alleged that, even though "an officer testified that he could not connect [Mr.] Carr to the crime scenes, [t]rial [c]ounsel was not ethically able to present any of an abundance of contrary evidence that would have done so, including, . . . evidence from Mr. Carr's cell phone." . . . . Thus, whether trial counsel was ineffective by failing to cross-examine detectives about the location of [Mr.] Carr's cell phone was preserved, too.

However, our review of the record reflects that Petitioner more directly included the issue in the section entitled: "Trial [c]ounsel did not adequately investigate the time stamping issues on another prime suspect's cellphone or request a call detail record analysis for that phone." In that section of his petition, Petitioner argued as follows:

> Among the most damning evidence presented against [] Petitioner during his trial was cell tower analysis that purported to demonstrate that [] Petitioner's "phone was near the scene of each crime close to the time of when those crime[s] happened." *Wright*, 2020 WL 3410247, at *7. No such evidence was introduced by the defense regarding other suspects, though, despite its clear relevance. When questioned about [Mr.] Carr being abandoned as a suspect, for example, Detective Hafley asserted that [Mr.] Carr was excluded as a suspect because his cell phone data did not "corroborate" that he had been present at the scene of either crime.

> . . . .

> Minimal investigation would also have revealed that no technical analysis was performed on [Mr.] Carr's extraction report to determine his location. Trial [c]ounsel had the ability to determine and ask Detective Hafley about this fact prior to trial, as he did not have such an extraction analysis in his discovery packet.

In addition, during closing argument at the post-conviction hearing, Petitioner referred to Mr. Carr's "call detail records" as enabling a person to "place somebody based on the various cellphone towers that their device is pinging off of." Petitioner noted that:

> for Detective Hafley to testify that he was able to eliminate [Mr.] Carr based on looking at his call detail records could not have been the truth based on where Mr. Carr claimed to be.

> In reality, Detective Hafley, admittedly is not an expert in analyzing call detail records. And so he wasn't able to give that testimony. And he

- 22 -

wasn't able to do a proper analysis of [Mr.] Carr's phone, but he was never asked about that at trial.

It is apparent that Petitioner referred to Mr. Carr's cell phone location data as call detail records. Because the post-conviction court's findings included discussion of Mr. Carr's call detail records and generally encompassed trial counsel's utilization of said records, we will consider it with the other ineffective assistance issues below.

### C. Failure to compel Mr. Carr's testimony

The State argues that Petitioner has waived consideration of his claim that trial counsel was ineffective for failing to compel Mr. Carr's testimony. In his reply brief, Petitioner argues that he explicitly raised the issue by discussing it in the conflict of interest section of the post-conviction petition. Petitioner states:

> [The] petition alleged ineffectiveness on the basis that, "[b]ecause [trial counsel] represented Mr. Carr, [trial counsel] not only did not but ethically *could not* meaningfully develop a defense theory that Mr. Carr was the person who was actually responsible for committing the murders[.]" . . . . [Petitioner] further alleged that [trial counsel]'s specific deficiencies included his failure to "call[] and cross-examin[e] witnesses about Mr. Carr's relationship with [Ms.] Cole and alleged confession" and [trial counsel]'s failure to "attempt[] to inculpate Mr. Carr, who was his own client." . . . . Thus, [Petitioner] also raised the issue of whether [trial counsel] was ineffective by failing to call [Mr.] Carr as a witness and inculpate him.

We cannot agree with Petitioner that trial counsel's failure to compel Mr. Carr's testimony was properly raised such that remand to the post-conviction court for further findings is necessary. *See* Tenn. Code Ann. § 40-30-104(d)-(e) (stating that the petitioner "shall include all claims known to the petitioner for granting post-conviction relief" and "allegations of fact supporting each claim for relief set forth in the petition"). The language Petitioner cites is the factual basis of his conflict of interest issue and does not fairly present a separate claim of ineffective assistance of counsel. Moreover, the post-conviction court's findings on the topic are limited to its discussion of the conflict of interest related to Mr. Carr, specifically, the pretrial hearing in which trial counsel asserted that he had issued a subpoena for Mr. Carr. Accordingly, we are without authority to review this issue. *See Holland*, 610 S.W.3d at 458.

### III. Ineffective Assistance of Counsel

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const.

art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### A. Conflicts of interest

Once the right to counsel has attached, the "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice." *Strickland*, 466 U.S. at 692. Trial counsel's actual conflict of interest will result in the constructive denial of counsel and prejudice will be presumed in cases where the petitioner demonstrates that an actual conflict of interest adversely affected the lawyer's performance. *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980); *see State v. King*, 703 S.W.3d 738, 785 (Tenn. Crim. App. 2024); *see also State v. Frye*, No. E2019-00686-CCA-R3-CD, 2021 WL 1971982, at

*25 (Tenn. Crim. App. May 17, 2021) ("Prejudice will only be presumed in those cases where the defendant has established that trial counsel 'actively represented conflicting interests' and that an actual conflict of interest adversely affected the lawyer's performance.") (cleaned up and quoting *Strickland*, 466 U.S. at 692), *perm. app. denied* (Tenn. Sept. 22, 2021).

Under the Rules of the Tennessee Supreme Court, an attorney "shall not represent a client if the representation involves a concurrent conflict of interest." Tenn. Sup. Ct. R. 8, RPC 1.7(a). As relevant here, concurrent conflicts of interest exist if "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person[.]" Tenn. Sup. Ct. R. 8, RPC 1.7(a)(2). "If a conflict arises after representation has been undertaken, the lawyer ordinarily must withdraw from the representation, unless the lawyer has obtained the informed consent of the client under the conditions of paragraph (b)." *Id.* at cmt 4.

> Even where there is no direct adversity between clients, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. The mere possibility of subsequent harm does not itself require disclosure and consent. The critical questions are: what is the likelihood that a difference in interests will eventuate and, if it does, will it materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client?

*Id.* at cmt 8. Put another way, an actual conflict of interest "includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties.'" *Frye*, 2021 WL 1971982, at *25 (quoting *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003) (citation omitted)). "The proper focus is solely upon whether counsel's conflict affected counsel's actions[.]" *Id.* (quoting *Netters v. State*, 957 S.W.2d 844, 848 (Tenn. Crim. App. 1997)).

### i.   Ms. Crutcher

Petitioner contends that the post-conviction court erred by finding that trial counsel was not representing materially adverse interests at the time of trial due to counsel's representation of Ms. Crutcher. He argues both that Ms. Crutcher was a current client of trial counsel—by virtue of the fact that he never formally terminated the representation— and that trial counsel's ethical obligations to Ms. Crutcher as a former client impaired

Petitioner's defense. Petitioner avers that trial counsel was ethically prevented from compelling Ms. Crutcher's testimony and confronting her with unspecified "evidence that incriminated her." He argues that trial counsel should have confronted her with "incriminating questions that cast her as a viable alternative suspect who had access to [Petitioner's] cell phone." Petitioner further argues that, if Ms. Crutcher had testified at trial and repeatedly asserted her Fifth Amendment rights as she did at the post-conviction hearing, the jury would not have convicted Petitioner.

The State responds that trial counsel's representation of Ms. Crutcher was limited to the police interview four years before the trial and that, as such, it did not create an actual conflict of interest. The State also argues that no evidence was presented that the successive[4] representation of Ms. Crutcher and Petitioner adversely affected trial counsel's performance.

We note that the initial post-conviction petition based this issue on RPC 1.7(a)(2) relative to conflicts of interest arising from concurrent representation. Although Petitioner also discussed RPC 1.9(a) governing conflicts of interest arising from former clients in his post-hearing brief and on appeal, the post-conviction court limited its examination of this issue to RPC 1.7.

Similarly to RPC 1.7, RPC 1.9 provides that a lawyer "who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing." We note that, under either standard, the key factual issue remains whether Ms. Crutcher's interests were materially adverse to Petitioner's.

The post-conviction court found that Ms. Crutcher was never charged with the murders and that "no evidence in the record suggests [she] committed either murder." The

---

[4] In the State's brief, it urges this court to limit the application of the *Cuyler* prejudice standard to multiple concurrent representation of criminal defendants. *See State v. King*, 703 S.W.3d 738, 783 (Tenn. Crim. App. 2024) (concluding after examining *Cuyler* and subsequent federal case law that "the proper standard by which to analyze conflict of interest claims, absent a timely objection [by defense counsel], is the rule set out in *Cuyler*."); *cf. Mathews v. State*, No. M2017-01802-CCA-R3-PC, 2019 WL 7212603, at *24 (Tenn. Crim. App. Dec. 27, 2019) (stating that *Cuyler*'s holding was "limited [ ] to actual conflicts resulting from a lawyer's representation of multiple criminal defendants[.]") (citations omitted). We need not address the prejudice issue because we conclude below that trial counsel did not have an actual conflict of interest. We briefly note, however, that *King*, as a reported opinion, is considered controlling authority over this court's unreported opinions, including *Mathews*. Tenn. Sup. Ct. R. 4(G) (stating that "unpublished opinions . . . shall be considered persuasive authority" and that "[o]pinions reported in the official reporter . . . shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction.").

court found that trial counsel represented Ms. Crutcher for her police interview but was "unable to conclude that four . . . years later at [] Petitioner's jury trial that [trial counsel] was actively representing conflicting interests" or that the conflict adversely affected trial counsel's performance.

The record supports the post-conviction court's finding that, although trial counsel represented Ms. Crutcher during her police interview, he did not actively represent adverse interests at Petitioner's trial four years later. Ms. Crutcher was Petitioner's girlfriend and the mother of his child, and she told the police that Petitioner was with her at the time of the murders. Detective Hafley, General Kyle-Castelli, and trial counsel all testified that, although Ms. Crutcher was a person of interest, she was not suspected of having perpetrated the murders. Ms. Crutcher agreed to testify as an alibi witness until she changed her mind abruptly after the fourth day of trial. Trial counsel told Petitioner that he could subpoena her but that she was no longer a reliable alibi witness because they did not know what her testimony would be. Trial counsel testified that Petitioner said he had spoken to Ms. Crutcher and that she would testify as planned.

The record does not preponderate against the post-conviction court's finding that trial counsel did not represent materially adverse interests due to his representation of Ms. Crutcher. Petitioner is not entitled to relief on this basis.

### ii.    Mr. Carr

Petitioner argues that the record preponderates against the post-conviction court's finding that trial counsel never represented Mr. Carr. The crux of Petitioner's issue is that trial counsel's varied explanations of the circumstances of the courthouse interview, which Petitioner characterizes as incompatible with one another, rendered his testimony incredible. Petitioner urges us to consider the contemporaneous documentation in the record as well as Detective Hafley's testimony in this regard. The State responds that the record supports the post-conviction court's accreditation of trial counsel's testimony.

The post-conviction court found that Petitioner had not proven by clear and convincing evidence that trial counsel represented Mr. Carr in the courthouse interview. The post-conviction court credited trial counsel's testimony "adamantly" denying ever representing Mr. Carr or speaking to him privately, as well as his explanation that he brought his son to the interview to avoid a potential conflict. The post-conviction court found that both trial counsel and his son were present for the majority of Mr. Carr's interview and that, based upon the interview alone, it could not conclude that trial counsel represented Mr. Carr. The post-conviction court noted that the police reports submitted by Petitioner "simply state that [trial counsel] called to set up a time to talk to" Mr. Carr and Petitioner at the fifth floor of the courthouse.

Relative to the pretrial conference in which General Kyle-Castelli commented that trial counsel previously represented Mr. Carr, the post-conviction court found that the characterization was "conclusory and unsubstantiated." The court noted that it gave her statement "minimal weight" in the determination of whether an attorney-client relationship existed.

The post-conviction court found that trial counsel's seeking to introduce Mr. Carr's confession to Mr. Pirtle at the pretrial hearing was "illuminating and persuasive" evidence that trial counsel never represented Mr. Carr and owed him no loyalty. The post-conviction court gave the finding "great weight."

As the finder of fact, the post-conviction court was in the best position to assess the credibility of the witnesses, including trial counsel. Any inconsistencies in trial counsel's testimony were resolved by the post-conviction court, and it is not the province of this court to disturb its credibility determinations or the weight it gave the evidence. *Fields*, 40 S.W.3d at 456. Petitioner has not established that the record preponderates against the post-conviction court's finding that trial counsel never represented Mr. Carr, and he is not entitled to relief on this basis.

### B. Failure to compel Ms. Crutcher's testimony

Petitioner contends that the post-conviction court erred by finding that trial counsel's failure to compel Ms. Crutcher's testimony was not deficient. The State responds that the record supports the post-conviction court's finding that trial counsel's decision not to subpoena Ms. Crutcher was reasonable under the circumstances and that her testimony would not have affected the outcome of the trial.

At a post-conviction hearing, when a petitioner presents a witness whom he claims should have testified at trial, the post-conviction court must determine whether such testimony would have been admissible and whether it was material to the defense. *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008). If the post-conviction court determines that the proffered testimony would not have been admissible at trial or that, even if admissible, it would not have materially aided the petitioner's defense at trial, the post-conviction court is justified in finding that trial counsel was not deficient in failing to call that witness at trial. *Id.* If the proffered testimony is both admissible and material, the post-conviction court must then assess the witness's credibility. *Id.* at 869-70.

The post-conviction court found that Ms. Crutcher was Petitioner's girlfriend and that they had a child together. The post-conviction court found that the cell phone evidence, which showed Petitioner's communicating by phone with Ms. Crutcher throughout the night in question, "weighs against the credibility and potential success of an alibi defense." The court concluded that, given the totality of the circumstances and

"the all or nothing nature of alibi witness testimony," it was reasonable for trial counsel to interpret Ms. Crutcher's reluctance to testify as detrimental to Petitioner's case and that it was "prudent not to compel her testimony in front of the jury."

The record supports the post-conviction court's finding that trial counsel's decision not to subpoena Ms. Crutcher was not deficient. After explaining to Petitioner that Ms. Crutcher's change of heart rendered her an unpredictable and potentially harmful witness, trial counsel informed Petitioner of the option to subpoena her; Petitioner said he had spoken with Ms. Crutcher and that she would testify. We note that, as Petitioner's girlfriend, if Ms. Crutcher had asserted her Fifth Amendment rights on the witness stand, the jury could easily have interpreted her statements as making Petitioner's guilt more, rather than less, likely. Trial counsel's performance was not deficient, and Petitioner is not entitled to relief.

### C. Failure to consult/call an expert witness

Petitioner argues that trial counsel provided ineffective assistance because he did not consult or call as a witness a firearms expert to inform the jury that two guns were likely used in the victims' murders, that a Smith & Wesson firearm could have produced similar class characteristics to a Glock, and that Agent Scott's identification of a Glock in a social media photograph was beyond the scope of his expertise. The State responds that the post-conviction court correctly found that additional expert testimony would not have changed the outcome of the trial.

In *Harrington v. Richter*, the Supreme Court of the United States stated that "[c]riminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence[.]" 562 U.S. 86, 106 (2011). In *Kendrick v. State*, 454 S.W.3d 450 (Tenn. 2015), a case involving a petitioner who alleged that his counsel should have called an expert at trial, the Tennessee Supreme Court recognized that "[e]xpert testimony and forensic science evidence, in particular, have become crucial to many criminal cases" and that "[d]ue to the ubiquity and persuasive power of forensic science evidence, it has become necessary for defense counsel to be conversant with forensic science and to be prepared to challenge forensic science testimony—either through effective cross-examination or by marshaling expert testimony for the defense." *Id*. at 475. Our supreme court explained:

> There are cases . . . in which a defense attorney bears an affirmative duty to consult an expert, and perhaps to call an expert as a rebuttal witness . . . . [W]hen the prosecution's theory of the case hinges on expert forensic science testimony, the acquisition of an expert witness for the defense may be exactly what professional norms under *Strickland v. Washington* require.

In most cases, however, the decision to select an expert, or which expert to select, constitutes one of the "strategic" defense decisions that *Strickland v. Washington* shields from scrutiny. In many cases, cross-examining the prosecution's expert will be just as effective as, and less risky than, utilizing a rebuttal expert. Each case must stand on its own facts.

*Kendrick*, 454 S.W.3d at 474-75; *see Harrington*, 562 U.S. at 111 ("In many instances cross-examination will be sufficient to expose defects in an expert's presentation.").

The post-conviction court found that Agent Scott's trial testimony was that the bullets and cartridge casings from the Cole and Johnson crime scenes were not fired by the same weapon. The court noted Dr. Warren's testimony that Agent Scott's trial testimony was "complete and true" but that Agent Scott "could have clarified or supplemented some of his answers." The court stated that it did not "see how [trial counsel]'s failure to call his own expert to say the same thing caused [] Petitioner prejudice."

The record supports the post-conviction court's finding that Dr. Warren's testimony was not material to the outcome of Petitioner's trial. Dr. Warren opined that, although Agent Scott's report and testimony could have been clearer with respect to the possibility that a Smith & Wesson firearm was involved instead of a Glock and that the inconclusive comparison of the two sets of ammunition recovered at the respective crime scenes weighed toward two different firearms being involved, he did not dispute the accuracy of Agent Scott's findings. Similarly, Petitioner has not established that, had trial counsel objected to the social media photograph as beyond the scope of Agent Scott's expertise or cross-examined him regarding the limit of the TBI's accreditation, the outcome of the trial would have been different.

We note that this was not a case that "hinge[d] on" Agent Scott's expert testimony. *See Kendrick*, 454 S.W.3d at 474-75. Although the State argued at trial that the victims were killed using the same firearm, the jury heard from Agent Scott that the victims were possibly killed using different firearms, and as trial counsel noted, it is possible for a person to have more than one gun. The jury also heard evidence that more than one person may have been involved in the murders. Eyewitness accounts from the Johnson crime scene indicated that a thin person fled on foot and another drove Ms. Cole's car. Ms. Young testified that Petitioner, Ms. Cole, and Mr. Carr went into a back room and left the Glenview apartment together before Mr. Johnson's murder, during which Ms. Cole asked Petitioner not to shoot her, and Petitioner's cell phone call log reflected that he was in contact with Ms. Cole, Ms. Crutcher, Mr. Carr, and others throughout the night. In addition, the cell phone location data placed Petitioner near the scene of both murders; thus, even if trial counsel had consulted or called Dr. Warren as a witness, the evidence of Petitioner's participation would not have changed. Petitioner has not established prejudice under *Strickland*, and he is not entitled to relief on this basis.

- 30 -

### D. Failure to investigate and prepare for trial

Petitioner contends that trial counsel's investigation of the case and preparation for trial was deficient because counsel failed to (1) cross-examine Detective Hafley using Mr. Carr's cell phone location data and elicit that Detective Hafley was not a cell phone expert to show that Mr. Carr was prematurely eliminated as a suspect; (2) "push" detectives to obtain major case prints for Mr. Carr and question the State's fingerprint expert about why a full comparison to Mr. Carr's prints was not made; and (3) have the DNA evidence from the lollipop stick and Ms. Johnson's boxers tested against other suspects and Ms. Johnson's other romantic partners.

"Trial counsel has a duty to investigate and prepare a case, and this duty derives from counsel's basic function 'to make the adversarial testing process work in the particular case.'" *Nesbit v. State*, 452 S.W.3d 779, 796 (Tenn. 2014) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986)). Under *Strickland*, counsel's duty is "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions[,]" and "what investigation decisions are reasonable depends critically on such information." *Id.* "Counsel is not required to interview every conceivable witness." *Nesbit*, 452 S.W.3d at 797 (citing *Davis v. State*, 912 S.W.2d 689, 700-01 (Tenn. 1995); *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995)). Additionally, an attorney need not pursue an investigation that would be fruitless. *Strickland*, 466 U.S. at 691.

Furthermore,

[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and [j]udicial scrutiny of counsel's performance must be highly deferential.

*Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (alternations in original) (citations omitted) (quoting *Strickland*, 466 U.S. at 688-89) (internal quotation marks omitted).

Likewise, a petitioner is entitled to adequate preparation by counsel so that counsel can make informed decisions concerning "trial strategy" and make "tactical choices" during the trial. *Harris v. State*, 947 S.W.2d 156, 163 (Tenn. Crim. App. 1996) (stating that this court defers to trial strategy and tactical choices based upon adequate preparation). Adequate preparation does not mean perfect preparation. *Id.* To be effective, the

representation of counsel, including preparation for trial, must be within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936; *Goad*, 938 S.W.2d at 369. "Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner." *Baxter*, 523 S.W.2d at 935 (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974)).

### i.    Cross-examination related to Mr. Carr's cell phone data

Petitioner asserts that trial counsel should have used Mr. Carr's cell phone location data and examined Detective Hafley about his lack of expert credentials in data analysis to demonstrate that Detective Hafley prematurely eliminated Mr. Carr as a suspect. Petitioner avers that because Mr. Carr claimed to have been at the Glenview apartment the entire night, his cell phone would have "pinged" the same towers as Petitioner's cell phone, thus demonstrating that the detectives decided not to pursue Mr. Carr in spite of the evidence against Petitioner and Mr. Carr being equal. However, in the post-conviction petition, Petitioner claimed that trial counsel should have elicited that Mr. Carr's location data was never examined, *i.e.*, that it did not exist.

The State avers that the post-conviction court properly found that Petitioner was not prejudiced.

We note that Petitioner did not exhibit the location data—or evidence that no such data existed—to the post-conviction hearing or use any such data to question Detective Hafley; neither we nor the post-conviction court can speculate about the effect of unknown records on Detective Hafley's testimony. *See generally Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) ("It is elementary that neither a trial judge nor an appellate court can speculate or guess on the question of . . . what a witness's testimony might have been if introduced by defense counsel."). The record supports the post-conviction court's general finding that evidence relative to Mr. Carr would not have negated the other evidence of Petitioner's guilt. Accordingly, Petitioner has not proven that trial counsel was deficient in his cross-examination of Detective Hafley or any prejudice resulting from the alleged deficiency. He is not entitled to relief.

### ii.    Fingerprint evidence

Petitioner contends that trial counsel's failure to "push detectives to take [Mr.] Carr's major case prints" and "question the State's experts about why complete comparisons were not made" was deficient; he states without elaboration that this prejudiced his defense. The State responds that the post-conviction court properly found that Petitioner was not prejudiced.

The post-conviction court found that, "given the dearth of evidence in the record of [Mr.] Carr's involvement," trial counsel's decision not to inquire about why detectives decided not to request major case prints for Mr. Carr was reasonable and did not undermine confidence in the trial's outcome. The record supports this finding. Detective Hafley testified that, after taking the same steps to investigate Mr. Carr and Petitioner, they were unable to connect Mr. Carr to the murders. Although Mr. Carr's major case prints were not obtained, his fingerprints were compared to at least three prints from the Johnson crime scene, and he was excluded as a contributor. However, even if Mr. Carr's fingerprints had been present, none of the evidence of Petitioner's guilt would have changed. Accordingly, Petitioner has not established that trial counsel's treatment of the fingerprint evidence was deficient or that he was prejudiced, and he is not entitled to relief on this basis.

### iii. Failure to seek DNA testing

Petitioner contends that trial counsel's failure to compare the DNA samples from the Johnson crime scene to other suspects prejudiced his defense because the presence of a potential romantic partner other than Ms. Cole who had motive to kill Mr. Johnson would have "collapsed" the State's case. The State responds that "the prejudice analysis does not permit wild speculation."

The post-conviction court found that Petitioner failed to demonstrate that the outcome of the trial would have been different if the lollipop stick DNA had been compared to Ms. Cole, Ms. Todd, Ms. Conway's teenage sister, and Mr. Carr, or the DNA from Mr. Johnson's boxer shorts had been compared to Ms. Todd or Ms. Conway. The court found that "these results would not have had any effect on the evidence that ultimately convicted the Petitioner, such as his cell phone records, his jailhouse confession, and his social media postings." The record supports the post-conviction court's findings—as we stated above, the involvement or presence of third parties at the Johnson crime scene does not change the sufficiency of the evidence supporting Petitioner's conviction.

### E. Cumulative Error

Petitioner contends that cumulative error warrants reversal in this case. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings. *Id.* at 77. In other words, only where there are multiple deficiencies does this court determine whether they were cumulatively prejudicial. In this case, because we have not found any errors, cumulative error review is unwarranted. Petitioner is not entitled to relief.

## IV.    Post-Conviction DNA Analysis Act

Finally, Petitioner contends that the post-conviction court erred by failing to adjudicate his request for DNA testing of the lollipop stick and swabs from Mr. Johnson's boxer shorts; he requests that we remand the case to the post-conviction court for further findings.  The State responds that the post-conviction court's findings of fact implicitly address Petitioner's issue such that a remand is unnecessary.

Under the DNA Act, a person convicted of and sentenced for first degree murder may, at any time, file a petition "requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence."  Tenn. Code Ann. § 40-30-303.  Upon the petitioner's request, the trial court shall order DNA analysis if the following four requirements are met:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
>
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

Tenn. Code Ann. § 40-30-304.

If a petition does not meet the criteria for mandatory testing, a post-conviction court has discretion to order testing if a "reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction" and the criteria in (2), (3), and (4) are met.  Tenn. Code Ann. § 40-30-305.  A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Powers v. State*, 343 S.W.3d 36, 54 (Tenn. 2011) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (citations and quotation marks omitted).  Although the post-conviction court must presume that the DNA analysis at issue

is exculpatory or favorable to the defense, the court "must focus on the strength of the DNA evidence as compared to the evidence presented at trial." *Id.* at 55.

In his petition for post-conviction DNA analysis, Petitioner sought comparison of the lollipop stick DNA sample to DNA samples from Ms. Cole, Ms. Todd, Ms. Conway's teenage sister, and Mr. Carr. He also sought comparison of the two samples from Mr. Johnson's boxer shorts to DNA samples from Ms. Todd and Ms. Conway's teenage sister. The State did not contest elements (2), (3), and (4); accordingly, the post-conviction court confined its examination of the issue to whether a reasonable probability existed that Petitioner would not have been charged or convicted or whether the verdict or sentence would have been more favorable.

The post-conviction court did not separately address Petitioner's request for DNA testing other than acknowledging it in a footnote of its order. However, in its analysis of the ineffective assistance of counsel claim related to trial counsel's not having the DNA evidence tested, the court found as follows:

> Considering the totality of the proof presented at trial, the [c]ourt finds that the Petitioner has failed to demonstrate that the outcome would have been different if this DNA testing had occurred, even if the test results had been positive. The [c]ourt is of the opinion that these results would not have had any effect on the evidence that ultimately convicted the Petitioner, such as his cell phone records, his jailhouse confession, and his social media postings.

We agree with the State that the post-conviction court's factual findings are sufficient for us to conclude that Petitioner is not entitled to DNA testing under mandatory or discretionary criteria. The jury heard at trial that Petitioner did not match either DNA sample taken from the Johnson crime scene. Accordingly, the most favorable result to Petitioner would be if Ms. Cole, Ms. Todd, Ms. Conway's teenage sister, or Mr. Carr was identified using either DNA sample, thus establishing, at best, that one or more of them was in the car with Mr. Johnson just before he was killed.[5] Petitioner avers that he could have used a third party's independent motivation to kill Mr. Johnson to undermine the State's theory of the case. However, none of the strong evidence of Petitioner's guilt would have changed, most notably his jailhouse confession and cell phone location data. Because Petitioner did not establish that favorable DNA results would have affected the State's

---

[5] We note, and Petitioner has acknowledged, that there is no indication of how long the lollipop stick had been in Mr. Johnson's car.

decision to charge him, the verdict at trial, or his sentencing, he is not entitled to DNA testing.[6]

## **Conclusion**

Based upon the foregoing, we affirm the judgment of the post-conviction court.

_s/Robert L. Holloway, Jr._
ROBERT L. HOLLOWAY, JR., JUDGE

---

[6] We note that Petitioner does not allege that DNA standards from Ms. Todd, Ms. Conway's teenage sister, and Mr. Carr are in the State's possession. This court has previously discussed that "nothing in the language of the [DNA] Act . . . authorizes a court to order an individual to provide a DNA sample." _Wilson v. State_, No. W2006-00685-CCA-R3-PC, 2007 WL 1227469, at *8 (Tenn. Crim. App. Apr. 26, 2007), _perm. app. denied_ (Tenn. Aug. 13, 2007); _see Pirtle v. State_, No. W2011-00925-CCA-R3-PC, 2012 WL 12932498, at *4 (Tenn. Crim. App. Oct. 4, 2012) (stating that this court "has previously cautioned that [t]he statute does not authorize the trial court to order the victim to submit new DNA samples years after the offense nor does the statute open the door to any other comparisons the petitioner may envision.'" (internal citation and quotation marks omitted)), _perm. app. denied_ (Tenn. Mar. 5, 2013); _Johnson v. State_, No. W2006-02208-CCA-R3-PD, 2007 WL 852147, at *6 (Tenn. Crim. App. Mar. 22, 2007) (noting the post-conviction court's acknowledgment that a third party "could not be forced to provide a new DNA sample"), _no perm. app. filed_.